# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| EMERSON SOFTWARE SOLUTIONS, INC., | ) |
| Plaintiff, | ) |
| v. | ) Case No.: 2:17-cv-00287-JHE |
| REGIONS FINANCIAL CORPORATION, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

On March 17, 2017, Defendant Regions Financial Corporation ("Regions") moved for the Court to enter an order compelling arbitration of all claims brought by Plaintiff Emerson Software Solutions, Inc. ("Emerson") and staying this case. (Doc. 7). Emerson opposes the motion. (Doc. 11). The motion is fully briefed, (docs. 7, 11, & 14), and ripe for review. For the reasons stated more fully below, the motion is **GRANTED**.

### I. Factual and Procedural Background[2]

Emerson and Regions have entered into several agreements in which Regions has obtained licenses to use software produced by Emerson. On May 24, 2004, the parties entered into a written End Use License Agreement for Risk Management Software, under which Emerson licensed "Risk

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 12).

[2] In ruling on a motion to compel arbitration, a district court looks to "the facts alleged in the . . . complaint." *U.S. Nutraceuticals, LLC v. Cyanotech Corp.*, 769 F.3d 1308, 1311 (11th Cir. 2014) (quoting *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1208 (11th Cir.2011)). Therefore, these "facts" are taken from the complaint.

Information Management Software" ("RIMS") to Regions. (Doc. 1 at ¶ 6). Emerson and Regions executed several additional agreements related to RIMS. On October 27, 2006, the parties entered into a Master Agreement, a Software License Agreement, and a Software Maintenance Agreement. (*Id.* at ¶ 7). The Software License Agreement gave Regions a perpetual, royalty-free, non-exclusive license to install, execute, and use RIMS. (*Id.* at ¶ 8). The parties also entered into a new Software Maintenance Agreement effective September 30, 2011, which provided that Emerson would continue to maintain and provide technical support for RIMS. (*Id.* at ¶ 9).

In 2010, Emerson presented a new piece of software, "eRIMS2," to Regions, and the parties developed a schedule for transitioning from RIMS to eRIMS2. (*Id.* at ¶ 11). Regions began using eRIMS2 in 2012, with significant modifications requested in 2013. (*Id.* at ¶¶ 10, 12). Unlike RIMS, eRIMS2 is cloud-based (rather than server-based) and is compatible with mobile devices; the software is also written using a different code and has a different feature set. (*Id.* at ¶ 13). Pursuant to an oral agreement between the parties, Regions was permitted to transition from RIMS to eRIMS2 and use eRIMS2 without paying a license fee as long as it continued paying Emerson's maintenance and technical support fees. (*Id.* at ¶ 14). No written purchase order was submitted for eRIMS2, nor was a written agreement ever made between the parties expressly concerning eRIMS2. (*Id.* at ¶¶ 15-16).

Regions continued to pay technical support and maintenance fees to Emerson through September 30, 2016, and Emerson continued to provide maintenance and technical support for eRIMS2. (*Id.* at ¶ 17). However, in August 2016, Regions verbally informed Emerson it no longer intended to use eRIMS2 after September 30, 2016. (*Id.* at ¶ 18). Responding to an inquiry by Emerson, Regions informed Emerson on September 7, 2016, that it believed it could continue to use eRIMS2 after September 30, 2016, without paying Emerson's technical support and

2

maintenance fees. (*Id.* at ¶ 19). Emerson responded via email, demanding Regions cease using eRIMS2 after September 30, 2016, and return all copies of the software to Emerson on October 1, 2016; however, Regions has retained possession of the software and has not paid technical support or maintenance fees for any period after September 30, 2016. (*Id.* at ¶¶ 20-21).

On February 22, 2017, Emerson initiated this action, alleging claims for breach of contract, promissory estoppel, conversion, and unjust enrichment. (*Id.* at ¶¶ 22-33). It seeks injunctive relief and monetary damages. (*Id.*). On March 17, 2017, Regions filed the instant motion to compel arbitration, alleging an arbitration clause in the Master Agreement requires the matter to be submitted to arbitration. (Doc. 7).

## II. Discussion

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, (the "FAA"), evinces "a liberal federal policy favoring arbitration agreements." *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98, 132 S. Ct. 665, 669, 181 L. Ed. 2d 586 (2012) (quoting *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). "Federal law establishes the enforceability of arbitration agreements, while state law governs the interpretation and formation of such agreements." *Employers Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2001). Before a court sends a claim to arbitration, it must determine (1) whether a valid arbitration agreement exists; (2) whether it affects interstate commerce; and (3) whether the claim falls within the scope of the arbitration provision. *See, e.g., Anders v. Hometown Mortg. Servs., Inc.*, 346 F.3d 1024, 1027 (11th Cir. 2003); *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 277 (1995). Any doubts as to the arbitrability of a claim are resolved in favor of coverage. *International Association of Machinists and Aerospace Workers, Seminole Lodge 971 v. United Technologies Corp.*, 778 F.2d 1562, 1564 (11th Cir. 1986).

Regions contends an arbitration provision found in the October 27, 2006 Master Agreement controls this dispute. That provision provides in relevant part:

> REGIONS AND EMERSON AGREE THAT ALL DISPUTES, CLAIMS, AND CONTROVERSIES BETWEEN THEM, WHETHER INDIVIDUAL, JOIN, OR CLASS IN NATURE, ARISING FROM THIS AGREEMENT OR OTHERWISE, INCLUDING WITHOUT LIMITATION CONTRACT AND TORT DISPUTES, SHALL BE ARBITRATED IN BIRMINGHAM, ALABAMA, PURSUANT TO THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION UPON REQUEST OF EITHER PARTY. ANY DISPUTE AS TO WHETHER A PARTICULAR DISPUTE OR CLAIM IS SUBJECT TO ARBITRATION UNDER THIS SECTION SHALL BE DECIDED BY ARBITRATION IN ACCORDANCE WITH THE PROVISIONS OF THIS SECTION . . . NOTHING IN THIS SECTION SHALL PRECLUDE ANY PARTY FROM SEEKING EQUITABLE RELIEF FROM A COURT OF COMPETENT JURISDICTION . . . .

(Doc. 7-1 at 19, § 14). Neither party contests the validity of this agreement or that it affects interstate commerce; instead, the parties dispute whether the verbal eRIMS2 agreement falls within the scope of the Master Agreement's arbitration provision. Regions argues the broad language sweeps up all disputes between the parties, whether related to the Master Agreement and RIMS or not. (Doc. 7 at 5-6; doc. 14 at 2). Emerson contends disputes related to eRIMS2, a separate product, are not governed by the Master Agreement at all and, even if they are, Emerson's claims for equitable relief may nevertheless be pursued outside arbitration. (Doc. 11 at 2-3).

**A. Applicability of the Master Agreement**

Emerson's primary argument is the Master Agreement's arbitration clause does not apply because eRIMS2 is a distinct product not covered by the Master Agreement, which Emerson argues only relates to RIMS.[3] Emerson points to several sections of the Master Agreement to

---

[3] Regions' motion presumes the dispute is solely related to RIMS, (*see* doc. 7 at 1-2), and in its reply, it disputes eRIMS2 and RIMS are different products, (doc. 14 at 3). Accepting the

4

support this contention, beginning with an introductory clause of the agreement stating "Regions desires to utilize and receive certain Products and Services provided by Emerson and such other related tasks as Regions specifies, and Emerson agrees to provide to Regions . . . ," (doc. 7-1 at 6). Next, Emerson highlights the Master Agreement's definition of the capitalized term "Products": "'**Products**' shall include, but not be limited to, all products to be provided by Emerson pursuant to an Order and/or that are subject to this Agreement," (*id.* at 7, § 1.20). The term "Order" is defined as "a purchase order, addendum, separate agreement, or [Statement of Work subject to the Agreement], together with this Agreement, either collectively or individually." (*Id.* at 7, § 1.18). Because there was no written Order for eRIMS2, Emerson contends, eRIMS2 is not a "Product," and thus the Master Agreement and its arbitration provision do not apply to the current dispute.[4]

As Regions notes, Emerson's interpretation of the Master Agreement adds the word "written" into the definition of "Order." (Doc. 14 at 3). Emerson points to no term of the Master Agreement that requires an Order to be written.[5] Emerson also insists the Software License Agreement and Software Maintenance Agreement relate solely to RIMS and predate the development of eRIMS2, but this has no bearing on whether the oral agreement relating to eRIMS2 is within the scope of the Master Agreement. It is, at a minimum, debatable that the eRIMS2

---

factual allegations in the complaint as true, as the Court must, eRIMS2 and RIMS are distinct pieces of software.

[4] Emerson does not specifically address whether its technical support role for eRIMS2 could be a "Service" under the Master Agreement, but the Master Agreement's definition of "Services" tracks the language used in its definition for Products. (Doc. 7-1 at 8, § 1.22).

[5] The Master Agreement does contain a provision stating it "shall not be modified or amended in any respect except by a written instrument executed by the respective authorized representatives of the Parties . . . ." (Doc. 7-1 at 21, § 18.11). Although Regions contends the eRIMS2 agreement was invalid because it required a signed writing under this provision, (*see* doc. 7 at 3), this appears to be based on its conflation of the two pieces of software.

contract is subject to the Master Agreement. To the extent there is a plausible interpretation of the Master Agreement's arbitration provision that covers the eRIMS2 contract, the undersigned must order arbitration, resolving any doubts in favor of coverage. *See International Association of Machinists and Aerospace Workers*, 778 F.2d at 1564. The parties have also expressly agreed that "any dispute as to whether a particular dispute or claim is subject to arbitration under this section shall be decided by arbitration in accordance with the provisions of this section." (Doc. 7-1 at 19, § 14). Absent a challenge to this delegation provision—and there is none, except, as discussed *infra*, to its applicability to Emerson's requests for equitable relief—the undersigned must give effect to the parties' intention to allow an arbitrator to determine the arbitrability of the claims (which includes whether the eRIMS2 contract is an Order under the Master Agreement). *Rent-A-Center., West, Inc. v. Jackson*, 561 U.S. 63, 72 (2010).

Additionally, the provision itself states it applies to "all disputes, claims, and controversies . . . arising from this Agreement **or otherwise.**" (Doc. 7-1 at 19, § 14) (emphasis added). In *SouthTrust Bank v. Bowen*, 959 Do. 2d 624 (Ala. 2006), the Alabama Supreme Court[6] held arbitration provisions containing the same "or otherwise" language contained within their scope "not only disputes between the parties that arise from the notes, but also disputes that arise in different manners in other ways." *Id.* at 632. Therefore, the Master Agreement's arbitration provision encompasses not only disputes related to the "Products and Services," but any disputes between the parties in any context. Emerson concedes *SouthTrust Bank's* holding means the broad language of this arbitration provision "may be construed to apply to disputes that are unrelated to

---

[6] The Master Agreement provides it "is governed by the substantive laws of the State of Alabama . . . ." (Doc. 7-1 at 21, § 18.10).

the Master Agreement (or other related documents)." (Doc. 11 at 9). Implicit in this is a concession that the arbitrability of the eRIMS2 agreement is debatable—in other words, that the eRIMS2 agreement is plausibly within the scope of the Master Agreement's arbitration provision. As stated *supra*, any doubts as to arbitrability must be resolved in favor of arbitration.

### B. Arbitrability of Equitable Relief

Emerson contends even if the arbitration provision encompasses the overall dispute, it is still entitled to pursue equitable relief due to the provision's exclusionary clause. (Doc. 11 at 9). That clause states:

> NOTHING IN THIS SECTION SHALL PRECLUDE ANY PARTY FROM SEEKING EQUITABLE RELIEF FROM A COURT OF COMPETENT JURISDICTION OR EXERCISING ANY SELF-HELP REMEDIES AS PROVIDED IN THIS AGREEMENT.

(Doc. 7-1 at 19, § 14).

The problem for Emerson is that it specifically waived its right to pursue the equitable remedies it seeks. The Master Agreement provides:

> Notwithstanding any other provisions contained in any agreement between the Parties to the contrary, specifically including the NDA, Emerson agrees that, if Products and/or Services are involved in any way, Emerson may not seek an injunction, specific performance, or other appropriate relief, but rather shall only be entitled to seek monetary damages.

(Doc. 7-1 at 21, § 18.12). The contracts in the cases Emerson cites in support of its argument do not contain waiver provisions; instead, the courts analyzing those contracts ended their analysis after finding the unambiguous language of the agreements supports the parties' intent to exclude claims from arbitration. *See Porter v. Williamson*, 168 So. 3d 1215, 1220 (Ala. 2015) ("Accordingly, we hold that, under the express and unambiguous terms of the agreement, Williamson's claims for specific performance and injunctive relief are not within the scope of the

7

arbitration provision."); *State of N.Y. v. Oneida Indian Nation of New York*, 90 F.3d 58, 63 (2d Cir. 1996) (district court ignored "clear and unambiguous" exclusionary clause); *Frydman v. Diamond*, No. 1:14-CV-8741-GHW, 2015 WL 5294790, at *6 (S.D.N.Y. Sept. 10, 2015) (exclusion of equitable remedies enforced when defendants were "unable to support their interpretation with the plain language of the contract itself"); *Archer & White Sales, Inc. v. Henry Schein, Inc.*, No. 2:12-CV-572-JRG, 2016 WL 7157421, at *6-7 (E.D. Tex. Dec. 7, 2016) (finding, in the absence of express delegation provision, the carveout for equitable remedies controlled).[7] Absent the waiver provision in this agreement, the same result might be appropriate here. But while the plain language of the agreement here supports the parties' intent to exclude equitable relief from arbitration, it also supports the parties' intent to deprive Emerson of the ability to seek equitable relief *at all*. Therefore, whether Emerson may seek equitable relief for its eRIMS2-related claims is a subpart of the question of whether the Master Agreement's delegation clause applies the oral eRIMS2 contract. To the extent there is uncertainty about whether the Master Agreement controls, as discussed *supra*, that is a question for the arbitrator to decide.[8]

---

[7] Also unlike *Archer & White Sales*, the contract at issue in this case contains an express delegation clause. (*See* doc. 7-1 at 19, § 14).

[8] Emerson urges the undersigned to determine whether Regions's claims under the delegation clause fit within the "wholly groundless" exception to delegation clauses. (Doc. 11 at 10-11). The exception requires a court, after finding the parties' intent to delegate arbitrability to an arbitrator, to assess whether the party seeking to compel arbitration asserts a "wholly groundless" basis for arbitrability. *See Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366 (Fed. Cir. 2006). The exception has been adopted by the Federal Circuit, *see id.*, the Fifth Circuit, *see Douglas v. Regions Bank*, 757 F.3d 460 (5th Cir. 2014), and the Sixth Circuit, *see Turi v. Main Street Adoption Services, LLP*, 633 F.3d 494 (6th Cir. 2011); however, the Eleventh Circuit has explicitly declined to address whether the "wholly groundless" exception applies in this circuit, *see Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1332 n.4 (11th Cir. 2016). In any event, whether the exception is (or should be) the law of this circuit is immaterial, because (1) Regions does not assert Emerson's equitable claims are subject to arbitration, but rather that the Master Agreement entirely forecloses

8

### III. Conclusion

For the reasons stated above, the motion to compel arbitration, (doc. 7), is **GRANTED.** This case is **STAYED**, and the parties are **ORDERED** to report back to the Court on the progress of arbitration **every six months** from the date of this order.

DONE this 19th day of October, 2017.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE

---

them, and (2) it is not "wholly groundless" for Regions to assert Emerson's claims are governed by the Master Agreement.